**BROTHERHOOD OF RAILROAD TRAINMEN FOR ST. LOUIS SOUTHWESTERN RAILWAY COMPANY and Brotherhood of Railroad Trainmen for Southern Pacific Company (Texas & Louisiana Lines), Plaintiffs,**

v.

**ST. LOUIS SOUTHWESTERN RAILWAY COMPANY and Southern Pacific Company (Texas & Louisiana Lines), Defendants.**

Civ. A. No. 4085.

United States District Court
E. D. Texas,
Tyler Division.
July 26, 1963.

Ben Johnson, Thomas W. Hathaway, of Johnson, Hathaway & Jackson, Tyler, Tex., for plaintiffs.

Jack W. Flock, of Ramey, Brelsford, Hull & Flock, Clyde W. Fiddes, Tyler, Tex., for defendant St. Louis, Southwestern Railway Company.

Tom M. Davis, of Baker, Botts, Shepherd & Coates, Houston, Tex., for defendant Southern Pacific Co. (Texas and Louisiana Lines).

SHEEHY, Chief Judge.

Plaintiffs instituted this action on March 25, 1963, seeking a permanent injunction enjoining the Defendants from putting into effect the coordination of the separate yard facilities and services of the Defendants at Dallas, Texas, until an agreement between Plaintiffs and Defendants with respect to rules, working conditions and rates of pay pertaining to the employees affected by such coordination had been reached or until the procedures and provisions of the Railway Labor Act (45 U.S.C.A. § 151 et seq.) had been fully utilized for the purpose of effecting changes in rates of pay, rules and working conditions pertaining to the employees to be affected by the coordination. The Plaintiffs further prayed that Defendants be temporarily and preliminarily enjoined and restrained from putting such coordination into effect until a hearing could be had and a determination made by the Court of the right of the Plaintiffs to a permanent injunction. Upon the filing of said complaint, a temporary restraining order as prayed for was issued with the provision that same was to expire within five days after entry unless for good cause it was extended, and a hearing on Plaintiffs' motion for preliminary injunction was set for March 29, 1963. At the time scheduled for the hearing on the preliminary injunction all parties appeared in open court by and through their respective attorneys of record, and it was then in open court agreed by and between all parties, acting by and through their respective attorneys of record, that the preliminary restraining order would be dissolved, and that the Defendants would make no attempt to put the coordination into effect until a trial on the merits was had and this Court decided whether the Plaintiffs were entitled to the permanent injunction prayed for. Thereafter the trial of the case on its merits commenced on May 6, 1963.

The facts, as shown by the admissions of the parties in their pleadings, stipulations made during the trial and as found from the evidence offered, are as hereinafter stated.

Each of the Plaintiffs is an unincorporated association and is a labor organization that engages in collective bargaining in the railroad industry. The membership of the Plaintiffs consists in chief of conductors, brakemen, yardmen and yardmasters, the same being operating employees employed by the Defendant railroads. Collective bargaining agreements between the Plaintiffs and the Defendants have been in effect for many years governing rates of pay, rules and working conditions of the crafts or classes of Defendants' employees represented by the Plaintiffs in collective bargaining.

Each of the Defendants is a railroad engaged in interstate commerce and is a "carrier" as defined in Section 1 of the

Railway Labor Act (45 U.S.C.A. § 151), and each is subject to the provisions of said Act.

On May 21, 1936, Plaintiffs, as participating organizations of employees, together with a number of other labor organizations, and Defendants, as participating carriers, together with a number of other carriers, entered into a job protection agreement, hereinafter referred to as the "Washington Agreement," the provisions of which were to be applicable to those changes resulting from a "coordination" with "coordination" being defined in said agreement as "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities." The Agreement was signed by 21 labor unions and by railroad representatives of railroads comprising 85 per cent of the railroad mileage in the United States.

A brief consideration of the history of the Washington Agreement, which appears in decisions of the Supreme Court of the United States, in the Congressional Record, in a letter the President of the United States wrote the Association of American Railroads and the Association of Railway Labor Executives, jointly, under date of March 6, 1936, and a joint press release issued by representatives of the parties on the day said Agreement was signed, is in order.

In the early 1930's at the height of the depression, most, if not all, of the railroads of this country were facing economic disaster. Whether or not the railroads could continue to operate was a matter in which the public had a direct interest. All informed in the matter realized that something had to be done in order to reduce the cost of operation of the railroads, and one of the ways in which to reduce such cost was to take action that would avoid unnecessary duplication of services and facilities of the railroads and permit a joint use of terminals and trackage wherever possible. With that in mind Congress enacted the Emergency Transportation Act of 1933 (48 Stat. 211 et seq.) which created the office of Federal Coordinator of Transportation. This Act sought "to encourage and promote or require action on the part of the carriers * * * which will (a) avoid unnecessary duplication of services and facilities of whatsoever nature and permit the joint use of terminals and trackage incident thereto or requisite to such joint use * * *." The Coordinator was given authority to issue orders requiring railroads to effect consolidations of various facilities. It was recognized by all concerned that many of the economies to be gained from consolidations or abandonments could be realized only at the expense of displaced railroad labor.[1] Consequently, Section 7(b) of said Act provided in part as follows:

> "The number of employees in the service of a carrier shall not be reduced by reason of any action taken pursuant to the authority of this title below the number as shown by the payrolls of employees in service during the month of May, 1933, after deducting the number who have been removed from the payrolls after the effective date of this Act by reason of death, normal retirements, or resignation * * * ; nor shall any employee in such service be deprived of employment such as he had during said month of May or be in a worse position with respect to his compensation for such employment, by reason of any action taken pursuant to the authority conferred by this title."

The Act provided that it would expire at the end of one year unless extended by a proclamation of the President for one year or any part thereof. The Act was extended through June 16, 1936, first by a presidential proclamation and there-

1. Railway Labor Executives' Association v. United States, 339 U.S. 142, 147, 70 S.Ct. 530, 94 L.Ed. 721.

after by a resolution of Congress. The manner in which the Act attempted to protect the employees affected by consolidations or abandonments was not satisfactory either to the railroads or to the employees. This was known to and recognized by the President of the United States, who, because of his concern over conditions in the railroad industry and the public interest involved, wrote the letter of March 6, 1936, above referred to. In that letter the President pointed out the necessity for the elimination of waste in railroad operations through consolidations and coordinated use of various facilities; that employees were entitled to protection against hardships resulting from consolidations and coordinated use of various railroad facilities; that the Emergency Transportation Act of 1933 had not afforded employee protection in a manner satisfactory either to the railroads or to the employees; and that the matter of employee protection in cases of consolidations and coordinated use of railroad facilities could be settled to the better advantage of all by negotiations rather than by legislation. After urging the railroads and the employees to undertake to settle the matter through negotiations, the President in said letter stated:

"Convinced, as I am, of the great benefits which will accrue to the railroad industry, to its employees, and to the country if this matter can be adjusted satisfactorily to both parties, I address you, as representatives, respectively, of the managements and the men, to express the hope that no effort will be spared on, either side to reach such an adjustment. May I suggest that before you permit such an effort to fail, you confer jointly with me?"

In response to the request contained in the President's said letter, representatives of the railroad industry and representatives of railroad employees unions entered into negotiations in an effort to reach an agreement whereby railroad employees affected by consolidations or coordinated use of facilities would be given some protection. These negotiations, which were lengthy, resulted in the Washington Agreement. That Agreement provides for the effectuation of coordinations by railroads of railroad facilities, prescribes the protection which will be afforded employees who are affected adversely thereby, and provides for compulsory, final and conclusive arbitration of any dispute or controversy arising in connection with a particular coordination. The apparent purpose of the Washington Agreement was to encourage and promote "coordinations" as defined in the Agreement and at the same time provide protection for employees affected by such coordinations and to provide a method for the settlement of any and all disputes arising between railroads and railroad employees incident to such coordination.

The preamble to the Washington Agreement provides in part as follows:

"also to be construed as a *separate agreement by and between and in behalf of each of said carriers and its employees* who are now or may hereafter be represented by any of said organizations which now has (or may hereafter have during the life of this Agreement) an agreement with such carrier concerning rates of pay, rules or working conditions." (Emphasis supplied)

Thus said Agreement becomes a part of the total labor agreement between the Defendants and the Plaintiffs. Section 3(a) of the Washington Agreement provides in part as follows:

"The provisions of this Agreement shall be effective and shall be applied whenever two or more carriers parties hereto undertake a coordination. * * * *"

Section 4 provides that each carrier contemplating a coordination shall give at least 90 days written notice and provides:

"Such notice shall contain a full and adequate statement of the proposed changes to be affected by such coordination, including an estimate

of the number of employees of each class affected by the intended changes."

Provision is then made for conferences between the parties in an effort to reach an agreement. Section 5 provides in part:

"In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13."

Sections 6 through 12 provide protection for employees affected by a coordination. Section 13 provides as follows:

"In the event that *any* dispute or controversy arises (except as defined in Section 11) in connection with a particular coordination, including an interpretation, application or enforcement of any of the provisions of this agreement (or of the agreement entered into between the carriers and the representatives of the employees relating to said coordination as contemplated by this agreement) which is not composed by the parties thereto within thirty days after same arises, it may be referred by either party for consideration and determination to a Committee which is hereby established, composed in the first instance of the signatories to this agreement. Each party to this agreement may name such persons from time to time as each party desires to serve on such Committee as its representatives in substitution for such original members. Should the Committee be unable to agree, it shall select a neutral referee and in the event it is unable to agree within 10 days upon the selection of said referee, then the members on either side may request the National Mediation Board to appoint a referee. The case shall again be considered by the Committee and the referee and the decision of the referee shall be final and conclusive. The salary and expenses of the referee shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them." (Emphasis supplied)

On October 20, 1961, Defendants, pursuant to the provisions of Section 4 of the Washington Agreement, served written notice upon the Plaintiffs and the employees represented by them of the intent of the Defendants to consolidate their respective yard facilities and services at Dallas, Texas, with the Defendant St. Louis Southwestern Railway Company designated as the operating company of the coordinated operations. Thereafter conferences were held between representatives of Plaintiffs and representatives of Defendants in an effort to reach an agreement relative to said proposed coordination and the protection of the employees represented by Plaintiffs who were to be affected thereby. No agreement having resulted from those conferences, the Defendants submitted the disputes between them and the Plaintiffs to the Committee provided for by Section 13 of the Washington Agreement. Before said Committee, the Plaintiffs took the position that that which the Defendants sought to do with respect to their respective facilities in Dallas did not constitute a "coordination" within the meaning of the Washington Agreement, and further took the position that since the so-called "coordination" proposed by the Defendants necessarily involved rules, working conditions and rates of pay of the employees to be affected by said coordination, the Committee had no authority to make any changes in the rules, working conditions and rates of pay of said affected employees, and, therefore, the proposed coordination should be denied and the case remanded to the property for further negotiations. On March 19, 1963, the Committee, with the aid of a neutral referee as provided for by said Section 13, which Committee and referee hereinafter will be referred to as the Arbitrator, rendered its decision permitting the coordination of the Defendants' facilities at Dallas, Texas, as proposed by the Defendants. A copy of said decision is attached hereto as

Appendix "A" and made a part hereof. By written notice dated March 22, 1963, the Defendants notified the Plaintiffs and the employees represented by them that the coordination of Defendants' facilities at Dallas, Texas, would become effective at 12:01 a. m., March 26, 1963. By letter dated March 22, 1963, the Plaintiffs, pursuant to Section 6 of the Railway Labor Act (45 U.S.C.A. § 156) gave written notice of their intention and desire to make and maintain an agreement for the protection of the employees represented by said Plaintiffs to cover the changes in rules, rates of pay and working conditions which would be brought about by the coordination of Defendants' facilities and services in Dallas, Texas. On March 27, 1963, Plaintiffs served upon the Defendants a list of their suggested changes in rules, rates of pay and working conditions as to the employees represented by them to be affected by the coordination. In its March 22, 1963, letter, above referred to, Plaintiffs suggested a date for initial conferences between Plaintiffs and Defendants as to the matters covered by the Section 6 notice. A conference between Plaintiffs and Defendants was held at Houston, Texas, on April 16, 1963. However Defendants at that conference and at all times subsequent thereto have denied that they are under any obligation or duty to bargain with reference to the demands of Plaintiffs for a new contract governing the rules, rates of pay and working conditions of employees affected by the coordination as a condition precedent to putting the coordination into effect and gave Plaintiffs notice of termination of further conferences on the matter. Thereupon, Plaintiffs requested the services of the National Mediation Board as provided for by the Railway Labor Act. That Board assumed jurisdiction of the controversy and docketed said controversy as case No. A–6934, which case was still pending before said Board at the time of the trial of this case, and, insofar as known to this Court, said case is still pending before said Board.

The existing collective bargaining agreements between the Plaintiffs and the Defendants provide, in effect, that the terms thereof relating to rules, rates of pay and working conditions can be changed only by mutual agreement or by changes made in accordance with the procedures established by the Railway Labor Act.

The Plaintiffs contend that the Arbitrator provided for by Section 13 of the Washington Agreement had no authority to effect the changes in the rules, rates of pay and working conditions of the employees affected by the coordination in question that will necessarily result from the coordination in the manner in which the Arbitrator ordered the coordination to be put into effect, and that the only way such changes in rules, rates of pay and working conditions could be effected is either by agreement of the parties or by following the procedure provided for by the Railway Labor Act. On the other hand, the Defendants contend that the Washington Agreement provides for the final and conclusive settlement, by arbitration, of all disputes involving coordinations, including disputes relative to rules, rates of pay and working conditions of employees necessarily affected by a coordination, and, therefore, the Arbitrator's decision in question is in all respects binding on the Plaintiffs.

There is no provision in the Railway Labor Act precluding parties subject thereto from voluntarily agreeing to compulsory arbitration. On the contrary the Act contemplates and encourages arbitration as a substitute for other methods of resolving disputes. (See 45 U.S. C.A. §§ 153 & 157). The trilogy of Supreme Court cases [2] established several fundamental principles of national labor

2. United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Enterprise Wheel & Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; and United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

policy relative to arbitration, including the following which are here pertinent:

(1) The settlement of disputes by arbitration is "a part of the continuous collective bargaining process."

■ (2) It is the federal labor policy to favor arbitration and to enforce awards rendered pursuant thereto wherever possible.

■ (3) In determining whether a particular dispute is arbitrable, a court should give the broadest possible application to the arbitration provisions of the bargaining agreement, and a particular dispute should not be held to be outside the scope of the arbitration agreement unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, with doubts being resolved in favor of coverage.

■ (4) In the absence of any express provision excluding a particular matter from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.

■ (5) Federal courts should decline to review the merits of arbitration awards rendered under collective bargaining agreements, and the question of interpretation of such agreements is for the arbitrator, and a court may not reverse an arbitrator's award even though the award permits the inference that the arbitrator may have exceeded his authority and even though the court's interpretation of the contract is different from that of the arbitrator.

It is apparent that, as to disputes arising out of coordinations covered by the Washington Agreement, it was intended by said Agreement that any and all such disputes be finally settled by the Arbitrator. It must be assumed that those entering into the Washington Agreement were aware that most, if not all, coordinations would of necessity involve changes in rules, rates of pay and working conditions of at least some of the employees affected by such coordinations. If it had been intended that disputes arising out of such necessary changes in rules, rates of pay and working conditions were not to be submitted for arbitration, it would have been an easy matter to except such disputes from arbitration. This was not done. On the other hand, Section 13 of the Agreement specifically provides that *any* disputes or controversies arising in connection with a particular coordination, including an interpretation, application or enforcement of any of the provisions of the Agreement, may be referred by either party to the Arbitrator for consideration and determination.

The putting of the coordination in question into effect will of necessity bring about changes in rules, rates of pay and working conditions as to at least some of the employees affected by such coordination. It would be impossible to put such coordination into effect without so doing. The Plaintiffs and the Defendants were unable to agree as to such changes. Thus there developed a dispute or controversy in connection with the coordination. The Arbitrator determined the dispute by deciding that the provisions of the existing bargaining agreement between St. Louis Southwestern Railway Company, the operating carrier, and its affected employees would govern the coordinated operation until a different agreement could be reached. Such decision does not require as a condition precedent to putting the coordination into effect that the Defendants either reach an agreement with the Plaintiffs as to the rules, rates of pay and working conditions of employees affected by the coordination or exhaust the procedures provided for by the Railway Labor Act. Furthermore it does not prevent the Plaintiffs from seeking through negotiations under the procedures provided for by the Railway Labor Act or otherwise a new agreement with the Defendants covering the rules, rates of pay and work conditions of employees affected by the coordination.

The Washington Agreement is a part of the total labor agreement between the Plaintiffs and the Defendants insofar as

the rights and obligations of said parties incident to a coordination are concerned. Consequently, anything done in accordance with the Washington Agreement, even though it effects changes in rules, rates of pay or working conditions of employees, is not a change of agreement within the meaning of the Railway Labor Act but is a change in accordance with an existing binding agreement, namely, the Washington Agreement.

■ Considering the terms of the Washington Agreement, the underlying reasons why said Agreement was made and the principles laid down by the trilogy of Supreme Court cases, hereinabove set out, it is concluded that the disputes arising out of the coordination in question, including the dispute with refence to changes in the rules, rates of pay and working conditions of employees affected by said coordination, were proper matters for decision by the Arbitrator under the provisions of the Washington Agreement, and, therefore, the decisions of the Arbitrator on those matters of dispute are valid decisions and are binding on the parties hereto, including the Plaintiffs.

It follows from the findings and conclusions hereinabove made and stated that Plaintiffs are not entitled to the injunctive relief sought, and that a decree should be entered denying Plaintiffs such injunctive relief. Nothing herein stated shall be construed as an expression of an opinion by the Court that the Defendants are not under a duty and obligation to comply with the provisions of the Railway Labor Act in an effort to reach a new agreement with the Plaintiffs relative to the rules, rates of pay and working conditions of the employees represented by the Plaintiffs who are affected by the coordination in question after the coordination is put into effect in accordance with the decision of the Arbitrator.

This Memorandum Decision will constitute the Findings of Fact and Conclusions of Law herein as authorized by Rule 52, F.R.Civ.P.

## APPENDIX "A."

### Docket No. 98–A, 98–B, 98–C

St. Louis Southwestern Railway Co. and Southern Pacific Co. (Texas & Louisiana Lines) vs. BLE, BLF & E, BRT.

SUBJECT: (1)—Would the arrangement described in the facts which follow constitute a "coordination" within the meaning of Section 2(a) of the Agreement of May, 1936, Washington, D. C.?

(2)—If the answer to Question No. 1 is affirmative what are the proper bases to permit the coordination of the separate yard facilities and services of St. Louis Southwestern Railway Company and Southern Pacific Company (Texas and Louisiana Lines) at Dallas, Texas, since the parties have been unable to compose their differences?

FINDINGS: The parties hereto are signatories to the Agreement of May, 1936, Washington, D. C. (Washington Job Protection Agreement).

On the basis of the entire record, all of the evidence, and reasonable inferences. I find and determine that:

Carriers are undertaking to combine their separate train yard facilities and services at Dallas, Texas, said yards being identified in the record as the St. Louis Southwestern's (St. LSW) Austin Street Yard and the Southern Pacific's (SP) Dallas Yard, also its Miller Yard, same being separate train yards within switching limits.

A consolidation of existing switching limits of participating Carriers is being proposed for establishing a unified yard (switching) operation under the Cotton Belt's (St. LSW) handling, and embracing all territory south of St. LSW Mile Post L–607, Pole 27, and all territory east of SP Mile Post 271.61, west of SP Mile Post 257.11, and west of Mile Post 313.93 on the Jacksonville branch.

DECISION: This dispute is here as a Section 5 controversy, but mainly because the parties could not settle on that part of an Implementing Agreement over and above what is contemplated by Section 5

of the Washington Job Protection Agreement.

The Organizations, representing the employes affected by changes consequent upon "coordination", complain about the lack of progress made in negotiations on the property and would not be adverse to the Committee remanding the case for further efforts in that regard. In the meantime, however, Carriers would face a continued stalemate in their efforts to make said "coordination" effective.

Section 4 notices were given on or about October 20, 1961. The dispute was lodged here on or about June 11, 1962. A ninety (90) days' written notice of a particular "coordination" is contemplated by Section 4, Agreement, supra. The date and place of a conference between representatives of all the parties interested in such intended changes, for the purposes of reaching agreements with respect to the application thereto of the terms and conditions of said Washington Agreement, must be agreed upon within ten (10) days after the receipt of said notices, and conference shall commence within thirty (30) days from the date of such notice.

While none is anxious to interfere in efforts, of participating Carriers and the Organization of employes affected, to reach a full accord for implementing the terms of the Agreement of May, 1936, Washington, D. C. and to reach an early settlement if they can on matters that otherwise must be left for handling under Section 6 of the Railway Labor Act, as amended, changes consequent upon "coordination" are not to be thereby unseasonably delayed. The parties clearly have ninety (90) days from date of notice pertaining to such intended "coordination", to reach an agreement. On the other hand, forced delays beyond ninety (90) days are unseasonable, and neither party to the dispute is acting with undue haste nor improvidently by invoking other processes for settlement of their dispute after that time.

This Committee need not be reminded that its delegated powers and authority are limited under Section 13 of said Washington Agreement. Hence, there is no intention here to interfere with the collective bargaining processes under this or any other agreement, or as provided by law.

Accordingly, the Committee does not undertake to make or enforce agreements on rates of pay, rules and working conditions. In the event of the parties failure to agree, however, on the arrangement of forces as contemplated by Section 5 of the Agreement over which this Committee does have supervisory control, the dispute may be submitted by either party for adjustment in accordance with Section 13.

Until the dispute was lodged with this Committee, there was no real disagreement that a "coordination" as defined by Section 2(a) of the Washington Job Protection Agreement, was being undertaken in fact. The Organizations have been heard to argue in this docket, however, as in some others, that Carriers' submission is premature, the Committee is without jurisdiction, and that a valid "coordination" under said Washington Agreement is not involved without approval first by the Interstate Commerce Commission of the contemplated "coordination". That argument is not valid. See Docket No. 88 for more on the subject with regard to the need for prior approval of the I.C.C.

Carriers' proposal for a division of work and selection of employes between the two Carriers contemplates the allocation of 60% to SP employes and 40% to St. LSW employes of all work in the coordinated switching operation and is based on engine hours worked, cars handled, etc., so far as practicable. Such division of work and selection of employes of Carriers involved is hereby deemed appropriate for application in this particular case.

The parties having failed to consummate a different agreement, the protective provisions of the Washington Agreement of May, 1936, shall apply to this particular "coordination".

What is left for making changes consequent upon a "coordination" effective,

naturally follows and it does not necessarily amount to undue interference with the processes of collective bargaining to mention what is manifestly contemplated and implied by the Agreement of May, 1936, Washington, D. C.

It is shown by the record that the coordinated facilities are to be operated by the St. LSW.

The contract now in effect, or which may hereafter be negotiated between the operating Carrier and its yard service employes shall govern in the coordinated operation until a different agreement can be reached. Road rules applicable on the lines of each participating Carrier for operating into, through, or out of switching limits before consolidation will apply in the coordinated operation until there is a different agreement.

Carrier parties to this dispute may now proceed, should they elect, to place the "coordination" into effect forthwith or at some later date under the above described arrangements, same to continue in effect until modified in accordance with the due processes of law, contract, or by mutual consent.