In the Matter of COMMUNICATIONS EQUIPMENT WORKERS, INC. (IND)

v.

WESTERN ELECTRIC COMPANY, Inc.

Civ. A. No. 21170.

United States District Court, D. Maryland.

Nov. 16, 1970.

Harry Goldman, Jr., Baltimore, Md., and Henry Mayer and Mayer, Weiner & Mayer, New York City, for petitioner.

Leonard E. Cohen, Joseph Bernstein and Monte Fried, Baltimore, Md., and Robert A. Levitt, New York City, for respondent.

NORTHROP, Chief Judge.

The petitioner union, Communications Equipment Workers, Inc. (Ind), (hereinafter known as "Union"), brings this action to contest an arbitration award that the Western Electric Company, Inc., the respondent herein, (hereinafter known as "Company"), properly graded the attributes "Education" and "Responsibility for Material or Product" for the job of Extruder Equipment Operator, M. S. 10480.

All hourly rated jobs at the Baltimore Works of the Company, including the job in question, are graded in accordance with the "Plan for Grading Non-Supervisory Hourly Rated Jobs," which is dated September 3, 1940. This plan was specifically incorporated in Article 14 of respondent's and petitioner's collective bargaining agreement dated April 24, 1967. The purpose of the "Plan" is set out as follows:

> It is generally agreed that there are differences in value among various jobs, some being of greater value than others. This difference in value is known to be related to the different amounts of education, experience, etc., required for successful performance of the job. Job grading, or the determination of the value of a job, can accordingly be accomplished by judging the amounts of education, experience, etc., required.

The "Plan" uses eleven attributes to determine the value of a particular job. These attributes are:

Education

Experience

Initiative and Ingenuity

Physical Demand

Mental or Visual Demand

Responsibility for Equipment or Process

Responsibility for Material or Product

Responsibility for Safety of Others

Responsibility for Work of Others

Working Conditions

Unavoidable Hazards

Each of these eleven elements is scored by degree, from first to fifth, and a given point value is assigned to that degree. By totaling up the point values for all eleven attributes, a figure is arrived at which corresponds to a job grade which, in turn, corresponds to a particular rate of pay. Any dispute arising as to the application of the "Plan" to a specific job is to be settled in accordance with the grievances and arbitration procedures established in Article 10 and Article 11 of the labor contract.

The dispute herein arose in 1967 when the Job Grading Department undertook to reexamine the job of extruder equipment operator because its duties had changed and particularly because the size of the crews had been reduced. At that time the job in question was in Labor Grade 36. The Department after its examination changed the scoring of three of the eleven attributes, although the grade level remained the same. The Union subsequently challenged the changing of two of the three attributes.

These two attributes are the ones in question in this case. It is the petitioner's contention that the grade of the attribute "Education" should not have been lowered from the second degree to the first degree and that the Attribute "Responsibility for Material or Product" should have been graded in the fourth degree rather than the third degree. A change in either one or both of the attributes would have placed the job in question into the next highest grade. This dispute was presented to a Board of Arbitration under the procedures outlined in Article 11 of the collective bargaining agreement. The Board upheld the Company's classification in a decision reported on July 15, 1969, with a dissenting opinion by the Union arbitrator. It is the Board's opinion that this court is asked to set aside.

The Union's specific challenge goes to the procedure the Company employed in evaluating the job. It is the Union's contention that the Company's use of the so-called "Code of Interpretation" in its evaluation of the job was improper in that the code was a document unilaterally created by the Company that did not have any basis in the collective bargaining agreement. In addition, the Union contends that the Board of Arbitration, in giving credence to the Code, acted outside its scope of authority and in direct contravention to the provisions of the collective bargaining agreement. Article 11(9) (a) provides that the Board of Arbitration shall have no authority to "[a]dd to, substract from or in any way modify the provisions of this Agreement."

The Company submits that the "Job Evaluation Plan," like most such plans, cannot be applied and administered without the exercise of judgment to resolve ambiguities or to fill in gaps. It alleges that for nearly 30 years the "Plan" has been applied and administered by the Company's job grading organization—the Wage Practices Department. During this time it contends that the Wage Practices Department has developed and applied interpretations which have re-solved ambiguities in accordance with the basic intent of the "Plan". Moreover, the Company contends that these interpretations were formally codified and presented to the Union early in March 1967, prior to the execution of the current labor agreement and that no objections to these interpretations were made at that time. Under Article 14 (1.2) of the labor contract, the Company is directed to "continue as heretofore its administration of the job evaluation plan currently in effect." Since these codified interpretations were merely a reflection of the practice that was in effect for many years prior to their adoption, the Company contends that they are by implication made a part of the labor contract.

The issue presented before this court, therefore, is whether the Board relied on the Code of Interpretation in formulating its opinion and if it did, whether such reliance was improper.

 As a general rule, courts are reluctant to overturn or set aside an arbitrator's decision. As a matter of judicial policy, courts will give deference to an arbitrator's opinion. A wide range of discretion is vested in them. When called upon to reverse an award, courts have adopted various standards. Among those variously employed have been: the reviewing court should not disturb the award (a) so long as the interpretation was not arbitrary, Local 7–644 Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Co., 350 F.2d 708, 712 (7th Cir. 1965); (b) even where the award permits an inference that the arbitrator may have exceeded its authority, Brotherhood of R. R. Trainmen v. St. Louis S. W. Ry., 220 F.Supp. 319, 325 (E.D.Tex.1963); or (c) merely because the court believes that sound legal principles were not applied, Dallas Typographical Union v. A. H. Belo Corp., 372 F.2d 577, 581 (5th Cir. 1967).

Even in earlier days when courts were less hospitable to arbitration, it was decided that they would not set aside an arbitrator's award for mere errors of fact or law; and mistakes in the

admission of evidence or misinterpretation of the contract giving rise to the arbitration would not vitiate the award.

■ A court should, however, interfere where the arbitrator (a) clearly went beyond the scope of the submission, Textile Workers Union of Am. v. American Thread Co., 291 F.2d 894, 896 (4th Cir. 1961); (b) where the authority to make the award cannot be found or legitimately assumed from the terms of the arbitration agreement, Truck Drivers and Helpers Union v. Ulry-Talbert Co., 330 F.2d 562, 563 (8th Cir. 1964); or (c) if the arbitrator made a determination not required for a resolution of the dispute, Socony Vacuum v. Socony Mobil Oil Co., 369 F.2d 480, 482 (2d Cir. 1966).

■ All matters of construction and interpretation are for the arbitrator to decide and are not subject to review by this court. International Brotherhood of Paper Mill Workers v. St. Regis Paper Co., 362 F.2d 711, 714 (5th Cir. 1966). Likewise, there should be no review by a court on the merits of an arbitrator's decision. In re American Machine & Foundry Workers, 256 F.Supp. 161 (S. D.N.Y.1963), aff'd, 329 F.2d 147 (2d Cir. 1964). To review the merits would create havoc with awards by arbitrators chosen to settle labor disputes.

In 1960, the Supreme Court in the *Steelworkers Trilogy* established a strong judicial preference for and deference to arbitration in labor disputes. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403(1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In *Enterprise Wheel and Car Corp.*, the Court stated that the judicial function is limited to the determination of whether the arbitrator's award "draws its essence from the collective bargaining agreement" and that "so far as the arbitra-

tor's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." 363 U.S. at 597, 599, 80 S.Ct. at 1362.

In *Warrior & Gulf Navigation Co.*, the Supreme Court stated: "Gaps [in the agreement] may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." 363 U.S. at 580, 80 S.Ct. at 1352. The Court also stated:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. Id. at 581–582, 80 S.Ct. at 1352.

Under the *Trilogy* and its progeny, it is abundantly clear that an arbitrator is given a wide latitude of discretion in interpreting an agreement.

■ Succinctly stated, the cases enumerated above suggest that a reviewing court cannot look to the merits of an arbitration award and a court cannot overturn the decree unless it is found that the award lacks any facts to support it or that the decree is not within the essence of the contract.

Our scope of review must therefore be limited to a determination of whether the Board of Arbitration acted within its authority and whether there are facts to support its decision. It is this court's opinion that the Board acted properly and its award should be affirmed.

■ Petitioner's first contention is that the Company and the Board acted improperly in placing reliance on the "Code of Interpretation." It is the Union's contention that since the contract made no reference to the "Code of Interpretation," to utilize this document in making job evaluations would be in violation of Article 11(9)(a) of the contract. This court feels that to uphold the Union's claim would place too re-

strictive an interpretation upon the labor agreement.

Under Article 14(1.2), the Company was to continue "as heretofore its administration of the job evaluation plan currently in effect." It was a question of fact for the arbitrators to determine whether the plan as previously administered utilized the practices that were subsequently incorporated in the "Code of Interpretation." This the majority so found. In the Board opinion it was found that "the company has been forced by the language of the Labor Agreement to make interpretations of the 'Plan' and [they] then codified them in 1967." (P. 48). After an extensive examination of the record presented before the Arbitration Board, this court finds that this decision was not clearly erroneous for there was sufficient evidence to support the Board's ruling. The plain meaning of this language was that the Company must continue the "Plan", as it was currently administered—both as to specifics and the guidelines and interpretations which had clarified the Plan over the many years that it had been in operation.

Notwithstanding the fact that the use of the Code was not wrongful, it is the opinion of this court that there was sufficient evidence to support the Board's opinion without resting on that contention. Under the "Plan", for a job to be graded in the *First Degree* of the attribute "Education", it must be shown that the job

> Requires a mental development usually equivalent to a formal grammar school education in order to think in terms of and understand the work being performed. Examples are: read, write, and use simple arithmetic involving counting, adding, subtracting, multiplying and dividing whole numbers.
>
> May involve *reading* of notes, tabulated information or simple dimensions such as length or width shown on blue prints, charts, orders or specifications but does not require the interpreting of the drawing. May also involve the posting on standard forms of information such as weights, count, etc.
>
> No apprentice or trades training included in this degree.

Requirements for placement in the *Second Degree* are:

> Requires a mental development equivalent to a two year formal high school education in order to think in terms of and understand the work being performed. Examples are: all around use of arithmetic involving adding, subtracting, dividing, and multiplying of decimals and fractions; maintaining routine departmental reports such as inspection reports, output reports, production schedules, etc.
>
> May involve *interpreting* drawings such as simple tool and machine drawings or apparatus assembly, wiring and schematic drawings, etc.
>
> Includes trades training consisting of a grammar school education plus two years of vocational training.

The Union bases its contention for a raise in the attribute from the first to the second degree on the following points:

(1) That the employees in that job classification engaged in all around use of arithmetic, including adding, subtracting, dividing, and multiplying of decimals and fractions.

(2) The fact that over a period of years, the job in question was placed in the Second Degree.

(3) The fact that subordinate crew members for which the Extruder Operator gave guidance and direction are rated in the Second Degree.

(4) That, other job duties—including guidance of subordinates and relationship with Company engineers—require, along with other attributes, a higher degree of education than the First Degree—the inter-relationship of attributes theory.

These contentions were considered by the Board and rejected. The Board found that there was "no evidence that the Extruder Operator was engaged in

'all around use of arithmetic including adding, subtracting, dividing and multiplying of decimals and fractions.'" The Board based its finding upon the fact that:

(1) The diameter tape supplied the Operators in question had these calculations built in—so that those employees in effect treat the figures as whole numbers.

(2) The use of a micrometer and obtaining of averages required only the use of simple short division.

(3) The mere use of gages and recording instruments has not been sufficient per se, to merit the attribute 'Education' to the second degree.

(4) While the Impartial Chairman agrees with the Union that these are only examples, there is no indication that the actual computational level has changed though the job may have become more complex since earlier job descriptions were written. Nevertheless it is clear in Union Exhibit #2 that when the Company took these into consideration it resulted in a first degree rating. Furthermore, that when the job was previously placed in the second degree—'Education'—it was the result of an obvious error.

a. The Company clearly placed it there because it mistakenly thought that the job 'required conversion of measured units to specification units by long division of decimals.'

b. No evidence was presented that the job even required that kind of arithmetic—or more important—it is quite clear from the testimony of the Union's own witnesses that Job M.S. 10480 does not require the use of that kind of arithmetic at the present time.

Likewise, there is sufficient evidence to sustain the Board's finding that the Company's placing of the attribute "Responsibility for Material or Product" in the third degree was correct. To qualify for a *Third Degree* rating, the job must have

[w]ork in which the failure to exercise proper care could reasonably result in waste or damage of material or product which would exceed $100 but seldom $250.

To qualify for the *Fourth Degree* classification, there must be

[w]ork in which the failure to exercise proper care could reasonably result in waste or damage of material or product which would exceed $250 but seldom $500.

It is the Union's contention that the job in dispute would be classified in the *Fourth Degree* but for the Company's practice of measuring the dollar limitations in terms of "Plan Dollars" or "1940 dollars." Under this practice the Company has attempted to approximate the dollar values which existed in 1940. The rule of thumb used by the Company since 1949 is to measure the dollar values in the degrees by one-half of the current dollar amounts. Therefore, if an incident of damage resulted in a loss of $200 current dollars, the loss, for purposes of the "Plan," is deemed to be $100.

The use of the "Plan Dollars" approach was implemented to prevent inflation from changing the relative weight of the attribute in question as compared to the other 10 attributes and to maintain consistency in administering the "Plan" through periods of fluctuation in the value of the dollar. It was apparent that if no adjustment were made in dollar amounts in response to rising inflation, the result would be to change degrees within the attribute as costs increase without an accurate reflection of the true value of the employee's service. If the money attributes were permitted to acquire greater relative weight than was contemplated when the "Plan" was adopted in 1940, the recognition given to the relative importance of this attribute at that time would be completely distorted.

This is not the first time that a challenge to the use of "Plan Dollars" was brought before an arbitrator. The Union has challenged the Company's use of this concept in at least two prior arbitrations, all without success. Carrier Corp., 64–3 ARB, Para. 9237 (Feinberg, Arbitrator,

1964) and Western Electric Co., Inc., Baltimore Works v. Communication Equipment Workers, Inc. (Judge Joseph R. Byrnes, Arbitrator, 1965).

The Board found after extensive testimony that regardless of the merits of the "Plan Dollar" approach, "there is no question but what the Company has utilized it since the inception of the 'Plan for Grading Non-Supervisory Hourly Rated Employees—the Job Grading Plan.' (Dated: Sept. 3, 1940)." Since the Company has consistently utilized this procedure, it became a part of the labor contract and it was incumbent upon the Union to negotiate this point if it wished a change. As the majority opinion stated:

> Any Job Evaluation Plan or Program is not, per se, self-sufficient. It must be administered and in such administration its provisions must be interpreted. The Plan that the parties negotiated in 1940 constitutes no exception. Under the well recognized doctrine of Administrative Initiative in the field of Industrial Relations, Unions have conceded that the initial administration and interpretation thereof rests with the employer, subject to the right of the Union to challenge the employer's administration and interpretations through the grievance procedure. That doctrine was estabished in the early 1940's, and has become well recognized and fully accepted in the subsequent years. It constitutes the only sensible approach to the administration of the process of collective bargaining * * *. The Labor Agreement involved in this case (Articles 10 and 11) fully recognizes this doctrine. Moreover, it makes an arbitration decision binding upon both parties, always with the right of either the Union and/or the Company to negate such decision by mutual consent during the term of the Labor Agreement, if they mutually agree that the decision has no sound basis, or to permit the losing party to negate it at the next contract negotiations. Thus, the ability of the losing party in an arbitration depends upon its bargaining power, in the last analysis, at the next bargaining table negotiations. Therefore, we have a situation in which a number of Arbitrators have been faced with the validity of the Company's concept of "Plan Dollars" and have recognized the Company's long standing insistence upon the validity of that concept, based upon the effect of this concept upon other attributes of the Plan.

> The Impartial Chairman, in his forty years as an Arbitrator, has not slavishly followed the decisions of prior Arbitrators, especially where they involve other companies, other Unions and not necessarily identical contract provisions. However, where the prior arbitrations involve the same company and Union and same contract provisions, then much greater weight must be given to those decisions. This is so not only because Arbitrators are supposedly "human beings" and subject to error, but more important that their decisions establish a precedent, which should not be over-ruled in the absence of the most conclusive proof that such decisions were completely unsupported by evidence and reasoning. Otherwise, an Arbitrator's decision becomes meaningless; it becomes subject to indiscriminate attack by the losing party, and loses its effect as the terminal point in the grievance procedure, which is very definitely a material part of the collective bargaining process. The Impartial Chairman is convinced that neither the Union nor the Company would want to see this happen.

■ Because the use of the "Plan Dollar" concept was made a regular part of the application of the Plan since 1949, this court feels that the Board was not in error in finding that it therefore became a part of the 1967 contract and if this concept was to be changed, it should be done through the apparatus of collective bargaining, rather than further attempts at arbitration.

■ After a careful review of all the evidence that was presented before the

Board of Arbitrators, this court finds that the Board was not in error in upholding the Company's grading of the attributes "Education" and "Responsibility for Material or Product." The decision of the Board of Arbitrators is therefore affirmed.