**WESTERN ELECTRIC COMPANY, INC.**

v.

**COMMUNICATION EQUIPMENT WORKERS, INC., Independent.**

Civ. No. HM75–308.

United States District Court, D. Maryland.

March 1, 1976.

As Amended March 9, 1976.

Monte Fried, Leonard E. Cohen, Baltimore, Md., Michael Hertzberg, New York City, for plaintiff.

Harry Goldman, Jr., Baltimore, Md., Paul M. Levinson, Henry Mayer, New York City, for defendant.

## MEMORANDUM OPINION

HERBERT F. MURRAY, District Judge.

This is a suit under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, in which the plaintiff, Western Electric Company (hereafter referred to as "Company") asks the Court to vacate and set aside the award of the Board of Arbitration issued in favor of the Communication Equipment Workers, Inc. (hereafter referred to as "Union"). The Union has counterclaimed to have the arbitration award confirmed, and both parties have moved for summary judgment. As the factual background of this dispute is particularly significant to a resolution of this issue, the Court will first review that background.

### Factual Background

Plaintiff Company is a New York corporation engaged in the business of manufacturing and installing telephone equipment for the Bell System and conducts its operations within the State of Maryland, various states of the United States and in the District of Columbia. Defendant Union is an independent labor organization representing employees for the purpose of collective bargaining. It maintains its principal office in Baltimore, Maryland, and represents various hourly-rated production and maintenance employees at Western Electric's Point Breeze Factory in Baltimore.

The Company and the Union entered into a collective bargaining agreement effective August 28, 1971 until August 27, 1974. Although the agreement has been succeeded by the current collective bargaining agreement between the parties, the grievance and arbitration involved herein arose under the prior agreement.

Article 14 of the collective bargaining agreement deals with "Job Grades." A job grade is a symbol expressing the relative value of a specific job with respect to other graded jobs. Under Article 14, Paragraph 1.3, the Company has the right to assign job grades to various jobs. That paragraph provides:

> The Company will continue to evaluate each job assignment in accordance with the job evaluation plan and will designate to each such job assignment one (1) of nine (9) job grades (numbered 32 to 40 inclusive) under the conditions hereinafter set forth.

The Union may contest the job grade assigned through the procedures in paragraph 5. Paragraph 5.1 provides:

> The Company will continue to designate job grades for new or changed job assignments and may revise either upward or downward the existing job grade for any job assignment. Only permanent job grades designated for a job assignment shall be subject to the grievance and arbitration provisions of this Agreement, provided such grievances are initiated during the twelve (12) months immediately following the date such grade was made effective. Nothing herein shall be construed as preventing the Union from calling the Company's attention to any incorrect job grade.

Job grades are assigned in accordance with a "Plan for Grading Non-Supervisory Hourly Rated Jobs" (hereafter referred to as Plan) and with the Interpretations and Guides. The use of the Plan requires that the determination of the

value of a particular job be based on eleven attributes. These attributes are:

1. Education
2. Experience
3. Initiative and Ingenuity
4. Physical Demand
5. Mental or Visual Demand
6. Responsibility for Equipment or Process
7. Responsibility for Material or Product
8. Responsibility for Safety of Others
9. Responsibility for Work of Others
10. Working Conditions
11. Unavoidable Hazards

Each of these eleven elements is scored by degree, from first to fifth, and a given point value is assigned to that degree. By totaling the point values for all eleven attributes, a figure is arrived at which corresponds to a particular rate of pay. The Plan describes "degrees" as follows:

> The relative value of a job is considered to depend on the following attributes which are present in varying *degrees* in the various jobs. These attributes are not of equal importance, and to give recognition to these differences in importance, weights or points are assigned to each degree of each attribute in accordance with the following table. Any job under consideration will properly fall into some one of the several degrees of each attribute. (table of degrees not printed herein)

The instant dispute had its beginnings when, on January 19, 1972, the Union filed a grievance with the Company asserting that the job of Twisting Machine Operator (PIC Copper Pairs), M.S. 10783, be upgraded from grade 34 to grade 35, that certain attributes under the job evaluation plan have their scoring increased, and that the Twisting Machine Operators (PIC Copper Pairs), M.S. 10783, receive retroactive pay.

The grievance was not resolved through the grievance procedure, and it was submitted by the parties to a Board of Arbitration, which was composed of a neutral chairman, Howard Kleeb, a Union arbitrator, Charles Sellman, and a Company arbitrator, George Johnson. The Board held hearings on February 28, 1974, March 26, 1974 and April 3, 1974. After the submission of briefs and reply briefs by counsel, the submission of thirteen joint exhibits, six Company exhibits, and twenty Union exhibits, and the taking of over 800 pages of testimony, the Board issued an Opinion and Award on January 22, 1975, sustaining the Union's grievance, upgrading the job to grade 35, increasing the scoring of three of four grieved attributes, and awarding retroactive pay to the employees involved. It is this award which the Company seeks to have the Court vacate.

*The Company's Position*

The Company relies in part on the decision of Chief Judge Northrop of this Court in *C. E. W., Inc. v. Western Electric Co.,* 320 F.Supp. 1277 (D.Md.1970), *aff'd per curiam* in 65 L.C. ¶ 11,771 (4th Cir. 1971). The Company contends that in that decision Chief Judge Northrop held that the Interpretations used by the Company in administering the Job Evaluation Plan were binding upon the parties since the collective bargaining agreement required the Company to continue to administer its job evaluation plan as it had in the past, which included the Interpretations. The Company points to the following statement from the opinion:

> Under Article 14(1.2), the Company was to continue 'as heretofore its administration of the job evaluation plan currently in effect.' It was a question of fact for the arbitrators to determine whether the plan as previously administered utilized the practices that were subsequently incorporated in the 'Code of Interpretation.' This the majority so found. In the Board opinion it was found that 'the company has been forced by the language of the Labor Agreement to make Interpretations of the 'Plan' and [they] then codified them in 1967.' (P. 48) After an extensive examination of the record

presented before the Arbitration Board, this court finds that this decision was not clearly erroneous for there was sufficient evidence to support the Board's ruling. The plain meaning of this language was that the company must continue the 'Plan,' as it was currently administered—both as to specifics *and the guidelines and interpretations which had clarified the Plan over the many years that it had been in operation.* (emphasis added by the Company; 320 F.Supp. at 1281)

The Company then contends that the history of the Interpretations was specifically presented in Western Electric's post-hearing brief which was submitted to the Board of Arbitration and thus was known to the members of the Board at the time they made their decision. The Company points to the language of Chairman Kleeb on page 33 of the Opinion and Award in which he states that: ". . . I must disagree with the conclusion stated in the Interpretations and Guides that no evaluation will be given for exposure to hearing." This statement shows, the Company argues, that Chairman Kleeb in effect refused to follow the collective bargaining agreement between the parties since, as found by Chief Judge Northrop, the Interpretations became a part of the collective bargaining agreement under Article 14, Section 1.2 and therefore were binding on the parties.

The Company's second objection to the award arises from the statement by Chairman Kleeb on page 24 of the Opinion and Award that "Because of the importance of the use of the Plan in fixing wage rates, I believe it was incumbent upon the Company to demonstrate *without a shadow of a doubt* that it properly rated this attribute." (Emphasis added) The Company contends that, while Chairman Kleeb was referring to the attribute of "working conditions," his assumption that the proper burden of proof on the Company was to prove its case beyond the shadow of a doubt necessarily influenced the entire Opinion and Award. The Company argues that it has traditionally been recognized by the parties herein, and by arbitrators who have decided cases involving the parties herein, that the burden is on the Union to show that Western Electric has violated its collective bargaining agreement in arbitration cases of the type involved herein. The Company further contends as follows:

> Even in discipline and discharge cases where the burden of proof is traditionally placed upon the employer by arbitrators under industrial common law, the burden normally required is that of 'a preponderance of the evidence,' with occasional arbitrators requiring proof 'beyond a reasonable doubt' in discharge cases involving alleged criminal conduct. There is no precedent in arbitration practice involving any industry, nor any precedent in the past practice of the parties hereto when arbitrating grievances similar to the one involved herein, which supports the Board of Arbitration's placing upon Western Electric the burden of demonstrating 'without a shadow of a doubt' that it properly rated the attributes grieved by the Union. Neither the Agreement between the parties, nor their past practices, nor the general industrial common law, permitted the Board of Arbitration to place such a burden upon Western Electric. (¶ 10 of Complaint)

In sum, the Company points to the two statements by Chairman Kleeb quoted above as grounds for vacating the Arbitrator's award. As stated in paragraphs 11 and 12 of the Complaint:

> 11. In deliberately and explicitly refusing to follow Western Electric's Interpretations which were an integral part of the parties' Agreement, the Board of Arbitration manifested an infidelity to its obligation to apply the Agreement and issue an Award which draws its essence from the Agreement.
>
> 12. In requiring that Western Electric demonstrate 'without a shadow of a doubt' that it properly rated the attributes grieved by the Union, the Board of Arbitration imposed a requirement upon Western Electric

which was not authorized by any provision contained in the parties' Agreement, and which conflicted with the accepted understanding of the parties that the burden of proof in attacking job grade ratings is on the Union—not Western Electric. Thus, the Board of Arbitration dispensed its own brand of industrial justice by choosing to ignore the law of the shop and by applying its own law which is without precedent or support in the history of labor arbitration.

The Company asserts these same grounds as the bases of its motion for summary judgment.

*The Union's Position*

The Union filed an answer and a counterclaim, in which it asks that the award of the Board of Arbitration be confirmed and specifically enforced; that the plaintiff be required to pay interest on all sums of money owed to the Twisting Machine Operators as a result of the award, from the date of the award to the date of payment; and that the defendant be awarded a reasonable attorney's fee. Defendant also filed a motion for summary judgment.

The Union begins by reviewing the legal principles which a court must follow in suits to vacate or confirm labor arbitration. These principles will be noted below in detail and will only be stated briefly here. Citing the *Steelworkers Trilogy*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), defendant contends that the award must be enforced if within the scope of the submission and authorized in the labor agreement. The defendant argues that there is no question that the Board decided only the issues that were submitted to it and that the parties' labor agreement authorized the award.

The defendant's second contention is that the Company's disagreement with the Board's legal reasoning is irrelevant. It contends that although the Board obviously did not believe that the Northrop decision was binding upon it, whether the Board was right or wrong in its legal judgment is irrelevant since courts have held that courts should not get involved with deciding whether the arbitrator applied "correct legal principles," that "mere errors of law" are not grounds to set aside an award, that awards should be upheld even if the arbitrator did not apply "sound legal principles," and that whether the arbitrator correctly found the "industrial common law" is not for the courts to decide. (The Union cites cases in support of this contention which will be noted below.)

The Union raises several other additional considerations and contentions, but these will not be stated here. The above arguments constitute the Union's main points, and the other points will be noted in the course of the Court's discussion below.

*Legal Principles*

The starting point for determining the legal principles which a reviewing court must follow in suits to vacate or confirm labor arbitration awards is the Supreme Court's 1960 decisions in the *Steelworkers Trilogy, Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, and *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

The Court in *Enterprise Wheel & Car Corp.* limited the role of the courts in reviewing arbitration awards to determining whether the award "draws its essence" from the collective bargaining agreement:

The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. . . . [T]he arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level—disputes that require for

their solution knowledge of the customs and practices of a particular factory or of a particular industry as reflected in particular agreements.

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet *his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. (363 U.S. at 596–597, 80 S.Ct. at 1360; emphasis supplied)

The Court in that case went on to state that, even if the arbitrator's opinion accompanying the award is ambiguous, the courts should not refuse to enforce that award:

A mere ambiguity in the opinion accompanying the award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinion. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement. (363 U.S. at 598, 80 S.Ct. at 1361)

Finally, the *Steelworkers Trilogy* makes it clear that the courts are not to review the merits of the award itself:

. . . [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. (*Enterprise Wheel & Car*, 363 U.S. at 599, 80 S.Ct. at 1362)

The Fourth Circuit in *Textile Workers Union of America v. American Thread Co.*, 291 F.2d 894 (4th Cir. 1961), interpreted the *Steelworkers Trilogy* to mean that an arbitration award is unenforceable only if it *exceeds the scope of the submission.* The court stated:

Even in earlier days when courts were less hospitable to arbitration, it was decided that they would not set aside an arbitrator's award for mere errors of fact or law; and mistakes in the admission of evidence or misinterpretation of the contract giving rise to the arbitration would not vitiate the award. It was only where the arbitrator clearly went beyond the scope of the submission that courts would interfere. . . . (291 F.2d at 896)

The court then noted the *Steelworkers Trilogy* and concluded:

In these cases, the court reaffirmed the long established doctrine that an *arbitration award is unenforceable if it exceeds the scope of the submission,* although where it is not 'apparent that he [the arbitrator] went beyond the submission,' courts should enforce the promise to arbitrate. (at 897; emphasis supplied)

Thus, the courts have two basic guidelines to follow in such suits. One is that the award must be enforced if it draws its essence from the agreement, and the second is that the award must be enforced if it does not exceed the scope of the submission. These guide-

lines have been followed in many lower court decisions. In *Local 1852 Waterfront Guard Association v. Amstar Corp.*, 363 F.Supp. 1026 (D.Md.1973), Chief Judge Northrop of this Court discussed the role of a federal court in reviewing an arbitration award. He cited the *Steelworkers Trilogy* and concluded:

The Supreme Court thus has enunciated clearly an attitude of judicial deference to arbitration awards. The Court found a compelling rationale for this judicial hands-off policy in the fact that the device of arbitration was a successful means by which industrial disputes may be peacefully settled. . . . As a result, lower courts have refused to overrule an arbitrator because they disagree with his interpretation of the contract . . . , because they disagree with the arbitrator's finding of fact . . . , or because the award was ambiguous. . . .

The arbitrator's discretion in interpreting the agreement, however, is not unlimited. The Supreme Court in *Enterprise Wheel* stated that an award is legitimate only so long as it draws its essence from the collective bargaining agreement. Unfortunately, this 'essence' test lacks sufficient specificity to provide lower courts with a consistent and workable standard in exercising their function of review. (363 F.Supp. at 1031; citations omitted)

Chief Judge Northrop continued by citing the *Textile Workers* case as establishing the standard that a court should interfere only "where the arbitrator clearly went beyond the scope of the submission."

In *Proctor & Gamble Manufacturing Co. v. Independent Oil and Chemical Workers*, 386 F.Supp. 213 (D.Md.1974), Judge Miller of this Court considered the scope of judicial review of an award and noted a recent Fourth Circuit opinion:

The Fourth Circuit has very recently recognized the continuing vitality of the doctrines of the *Steelworkers Trilogy* and has reaffirmed that the scope of judicial review does not include the merits of an award, but is limited to the narrow issues of whether the arbitrator's decision 'draws its essence' from the Agreement, or whether the grievance procedure was a sham, substantially inadequate or substantially unavailable, *Jim Crigger et al. v. Allied Chemical Corporation*, 500 F.2d 1218 (4th Cir. 1974). In that case, the Fourth Circuit rejected an argument that the arbitrator's interpretation of the collective bargaining agreement was so incorrect as to amount to a dispensing of his own brand of industrial justice, stating that the record showed that the arbitrator '. . . made [after] a careful, reasoned attempt to construe a hazy provision of the contract.' 500 F.2d at 1219. (386 F.Supp. at 221)

In *Proctor & Gamble, supra*, an action was brought by the company to set aside an arbitration award ordering reinstatement of discharged union members with back pay. The agreement provided for discharge "for cause," and the Board of Arbitration interpreted "cause" to mean "just cause." The company contended that the Board exceeded its authority in doing so. The court stated:

Plaintiff next contends that the Board majority clearly exceeded the scope of the submission by ordering reinstatement and back pay while simultaneously finding that the Company had violated no explicit provision of Article XVIII. This contention raises the question of whether the 'understood underlying premise' of *just* cause found by the Board to permeate Article XVIII is an 'addition' to, rather than an 'interpretation' of, that portion of the Agreement. If the premise is an 'addition' to the terms of the Agreement, the Board would have been prohibited by Article XV, Section 1, from taking cognizance thereof. Interpretation, on the other hand, is expressly made the Board's task. (386 F.Supp. at 222–223)

The court held that the Board was entitled to conclude that "cause" meant "just cause":

Once the Board had determined that the appropriateness of the termination

168

was before it, it had to measure the facts of the instant case by some standard. The Board seized upon the word 'cause' and 'fleshed it out' in an attempt to fashion therefrom a workable standard by which to judge Grievant's termination. 'Just cause' is a common standard for termination in collective bargaining agreements. . . .
Here again, the court must heed the Supreme Court in *Warrior & Gulf supra,* 363 U.S. at 581–582, 80 S.Ct. at 1352:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement though not expressed in it.

In essence, the Board, having only the word 'cause' to guide it, applied the 'industrial common law' to reach the conclusion that 'cause' meant 'just cause.' Whether the Board was correct in its assessment of the industrial common law is not a matter for this court to decide. (at 223)

■ The *Proctor & Gamble* case makes it clear, as did the Supreme Court in *Warrior & Gulf,* that, although the arbitrator's award must draw its essence from the contract, the arbitrator may look beyond the contract to the *practices* of the industry and the shop in reaching his award. As long as it is clear that the arbitrator is applying industrial common law, it is not the court's function to determine whether or not that law was correctly assessed.

Chief Judge Northrop in *C. E. W., Inc. v. Western Electric Co.,* 320 F.Supp. 1277 (D.Md.1970), *aff'd per curiam* 64 L.C. ¶ 11,771 (4th Cir. 1971), relied on by plaintiff herein, carefully reviewed the relevant authorities, stating:

> As a general rule, courts are reluctant to overturn or set aside an arbitrator's decision. As a matter of judicial policy courts will give deference to an arbitrator's opinion. A wide range of discretion is vested in them. When

called upon to reverse an award, courts have adopted various standards. Among those variously employed have been: the reviewing court should not disturb the award (a) so long as the interpretation was not arbitrary . . . ; (b) even where the award permits an inference that the arbitrator may have exceeded its authority . . . ; or (c) merely because the court believes that sound legal principles were not applied. . . .

> Even in earlier days when courts were less hospitable to arbitration, it was decided that they would not set aside an arbitrator's award for mere errors of fact or law; and mistakes in the admission of evidence or misinterpretation of the contract giving rise to the arbitration would not vitiate the award.

> A court should, however, interfere where the arbitrator (a) clearly went beyond the scope of the submission . . . ; (b) where the authority to make the award cannot be found or legitimately assumed from the terms of the arbitration agreement . . ; or (c) if the arbitrator made a determination not required for a resolution of the dispute. . . .

> All matters of construction and interpretation are for the arbitrator to decide and are not subject to review by this court. . . . Likewise, there should be no review by a court on the merits of an arbitrator's decision. . . . To review the merits would create havoc with awards by arbitrators chosen to settle labor disputes.

> \*   \*   \*   \*   \*   \*

> Succinctly stated, the cases enumerated above suggest that a reviewing court cannot look to the merits of an arbitration award and a court cannot overturn the decree *unless it is found that the award lacks any facts to support it or that the decree is not within the essence of the contract.*

> Our scope of review must therefore be limited to a determination of whether the Board of Arbitration acted within

its authority and whether there are facts to support its decision.

(320 F.Supp. at 1279–1280; citations omitted; emphasis supplied)

■ The test applied by Chief Judge Northrop, founded upon the *Steelworkers Trilogy,* gives a great deal of latitude to arbitrators. An award is to be enforced unless it lacks *any* facts to support it or unless it is not within the essence of the contract.

It should be noted that there are certain situations in which a court will deny enforcement of an arbitration award. In *Textile Workers, supra,* the Fourth Circuit Court of Appeals held that the submission of whether the union had proved the employer's violation of contract, which reserved to management the right to discipline or discharge for just cause, did not include the appropriateness of the employer's disciplinary action, and the arbitrator's determination that the employer's discharge of an employee for a third offense in permitting a lap to run through a carding machine was inappropriate and went beyond the submission. The court further held that the award could not be upheld because the arbitrator went outside the record and adopted a finding of a different arbitrator in an unrelated arbitration case. The court stated:

> We are not persuaded that the Supreme Court, in recent cases involving arbitration and the right to enforcement of arbitration agreements, intended that the courts should permit an arbitrator to render decisions which do such violence to the clear, plain, exact and unambiguous terms of the submission and the contract of the contending parties. (at 899)

However, as the Fourth Circuit made clear, this was a case in which there was no question that the arbitrator had exceeded his authority. The scope of the submission was evident, and the arbitrator had obviously gone beyond it. The court stated:

> It is impossible to overemphasize the terms and conditions of the submission which was the product of the agreement between the parties and which was both the source and limit of the arbitrator's authority and power. The submission was clearly made subject to the 'terms of the contract and within the limits of those terms, including the restrictions on the power of the arbitrator.'

\*   \*   \*   \*   \*   \*

By Article III the company had the right to discipline *or* discharge employees for just cause, surely a discretionary right, and more particularly when the offense is the 'failure of an employee to properly perform his job in accordance with Company standards,' an offense illustratively specified as 'just cause' in Article IV, Section 1. We find nothing in any section of Article IV or any other provision of the contract to show an intent to expressly contract away the rights reserved to management. The reservation of a right to either discipline or discharge for cause would be wholly ineffective and meaningless if the employer's action, pursuant to such right, is subject to review by an arbitrator on the basis of appropriateness. (at 898–899)

Another example of a court refusing to enforce the arbitrator's award is found in *Timkin Co. v. Local Union No. 1123, United Steelworkers of America,* 482 F.2d 1012 (6th Cir. 1973). That case involved a complaint seeking to vacate an award in favor of an employee who was unable to work due to imprisonment for a traffic violation and who was terminated under a bargaining agreement provision defining "voluntary quitting" as unauthorized absence of seven days. The court held that the arbitrator exceeded his authority in going beyond the testimony and the record to conclude that the "voluntary quit" provision did not apply since there was discriminatory conduct by the employer in consistently denying authorization in jail confinement situations while apparently maintaining liberal authorization policy in case of illness or injury and that the

purpose of the provision was to discipline employees who abandoned their jobs.

Again, in *Timken* as in *Textile Workers,* it was quite clear that the arbitrator had exceeded his authority. The company personnel director had testified that the company had a policy of denying authorized absences to employees confined to jail. However, the arbitrator went beyond this testimony and the record to conclude that such a policy was discriminatory.

*See also, Monongahela Power Co. v. Local No. 2332, IBEW,* No. 75–1329 (4th Cir., Feb. 9, 1976).

After this extensive review of the law, this Court concludes that it must approach an arbitrator's award fully cognizant of its limited authority. The Court can overturn the award only if it finds that the award lacks *any* facts to support it or that the award is not within the essence of the contract.

### Scope of Arbitrator's Authority over Job Grades

Before it can be determined whether or not the arbitrator has exceeded his authority or gone beyond the scope of the submission, it must be determined exactly what authority the arbitrator has. Article 11 is the general arbitration provision of the collective bargaining agreement. Paragraph 1 contains a standard broad arbitration clause:

Any dispute arising between the Union and the Company with respect to the interpretation of any provision of this Agreement or the performance of any obligation hereunder may be referred, during the life of this Agreement, to a Board of Arbitration in accordance with the procedure hereinafter set forth, provided:

\* \* \* \* \* \*

(b) Such dispute does not involve a provision of this Agreement which specifies that it is not subject to arbitration or from which it appears that the determination of the matter over which the dispute arose is within the judgment or discretion of the Company.

Paragraph 6 sets out the limits on the authority of the Board of Arbitration. That authority is limited to:

(a) The adjudication of a grievance or other matter in dispute which under the terms of this Agreement is subject to arbitration and which has been submitted in accordance with the procedure herein set forth; and

(b) The determination of such grievance or dispute by interpretation of the provisions of this Agreement and the application of such provisions thereto.

Paragraph 9 further limits that authority and provides that the Board has no authority to:

(a) Add to, subtract from or in any way modify the provisions of this Agreement; and

(b) Include in its award an obligation for the Company to make any retroactive adjustment of pay for any period prior to the date arbitration proceedings were instituted as specified in Paragraph 2 of this Article, except as provided in ARTICLE 14, JOB GRADES, or in the JOURNEYMAN TRADES PLAN AGREEMENT.

Article 14 concerns itself with Job Grades, and paragraph 5 provides specifically that the Company's designation of permanent job grades is subject to the grievance and arbitration procedure:

5.1 The Company will continue to designate job grades for new or changed job assignments and may revise either upward or downward the existing job grade for any job assignment. Only permanent job grades designated for a job assignment shall be subject to the grievance and arbitration provisions of this Agreement. . . .

5.2 Each grievance by the Union shall apply to a permanent job grade designated for a specific job assignment, shall be presented in writing and shall enumerate the attribute or attributes the Union alleges have been improperly scored by the Company, and shall further state the specific reasons for the Union's claim that each attribute

enumerated has been improperly scored by the Company. . . .

5.3 The provisions of ARTICLE 11, ARBITRATION, of this Agreement shall not apply to the job evaluation plan used by the Company.

It is not disputed by the parties that the agreement authorizes a Board of Arbitration to upgrade the job in dispute, to increase the scoring of the disputed job attributes, and to award retroactive pay not to exceed a period of one year from the date of the award. The parties submitted to the Board three basic issues:

1. Whether the job of Twisting Machine Operator (PIC Copper Pairs), M.S. 10783, should be upgraded from Grade 34 to Grade 35;

2. Whether the attributes of unavoidable hazards, working conditions, responsibility for the work of others and physical demand should be given higher scoring under the parties' job evaluation plan; and

3. Whether the employees involved should be awarded retroactive pay. (Affidavit of Gerald E. Swayne, President of C.E.W., p. 5)

The Union contested the scoring of four of eleven attributes, contending that the job should be upgraded from Grade 34 to Grade 35. Since the job had been scored at 189 points by the Company, in order for the job to be graded 35 the total point score would have to be increased from 189 points to 210 points for a 21 point increase. The lowest score in order to be assigned Grade 35 is 210 points. The following is a chart showing the attributes the Union grieved and the Union's contention as to what the appropriate score for each attribute should be and the Company's scoring of each attribute:

| Attribute | Co. Evaluation Degree | Points | Un. Evaluation Degree | Points | Difference Points |
|---|---|---|---|---|---|
| Unavoidable Hazards | 2 | 10 | 4 | 20 | 10 |
| Responsibility Work of Others | 1 | 5 | 3 | 15 | 10 |
| Working Conditions | 3 | 30 | 4 | 40 | 10 |
| Physical Demand | 3 | 30 | 4 | 40 | 10 |
| TOTAL | | 75 | | 115 | 40 |

The above chart shows that the Union believed 40 points should have been added to the job score, thereby easily placing the job in Grade 35 with a total of 229 points.

The Board issued an award increasing the scoring of three of the four disputed attributes. Following is a chart of the attributes whose point score was increased, showing the point count before and after the arbitration decision:

| Attribute | Degree Before Arbitration | Degree After Arbitration | Points Before Arb. | Points After Arb. |
|---|---|---|---|---|
| Responsibility | 1 | 3 | 5 | 15 |
| Working Conditions | 3 | 4 | 30 | 40 |
| Unavoidable Hazards | 2 | 3 | 10 | 15 |

The Company does not now contest the authority under the agreement of the Board to rule on these issues and to upgrade the job, but it contends that the Board exceeded the scope of what it was asked to decide. Specifically, the Company contests the change in degree and point value of the attributes of working conditions and unavoidable hazards. If the Board incorrectly sustained the Union's position in the scoring of these two attributes, the job would be scored only ten points higher than previously, not enough to upgrade the job. The Court will now turn to the scoring of these two attributes.

*Working Conditions*

The dispute over working conditions revolves around the burden of proof the Company contends the Board improperly imposed on the Company. As stated above, the Company objects to the Board statement that "Because of the importance of the use of the Plan in fixing wage rates, I believe it was incumbent upon the Company to demonstrate *without a shadow of a doubt* that it properly rated this attribute." (page 24)

■ The Court holds that the "without a shadow of a doubt" language does not furnish sufficient basis for vacating the arbitrator's award. First, after careful review of the award and opinion, the Court cannot agree with the Company that this burden of proof language is evidence that the arbitrator imposed a stiff and impermissible burden of proof on the Company throughout the entire arbitration proceeding. A review of the 35 page opinion reveals an extremely thorough and well-drafted opinion, in which the Board considered the large volume of evidence presented by both sides and came to a carefully reasoned decision. There is no indication that the Board forced the Company to overcome heavy odds against it in order to have its contentions considered carefully by the Board.

The Plan describes the attribute of working conditions as follows:

Working conditions relate to the surroundings or physical conditions under which the job must be done, over which the employee has no control, and which affect his mental or physical well-being. (page 13)

The Company has given this attribute the third degree with a point value of 30. The Union contends it should be given the fourth degree with a point value of 40.

The third degree is described in the Plan as follows:

Somewhat disagreeable work which generally involves a continuous element or factor or combination of elements or factors such as dirt, oil, grease, heat, fumes, noise, etc. of minor importance; or an element or factor or combination of elements or factors such as heat, cold, wet, noise, etc. of major importance but which are not continuous.

The fourth degree is described in the Plan thus:

Disagreeable work having an undesirable element or factor or combination of elements or factors of major importance such as heat, cold, wet, fumes, noise, etc., but which are continuous.

The data supplied by the Company in support of the grade ("Job Grade Substantiating Data") states:

The work is somewhat disagreeable, involving continuous exposure to (attenuated) noise of minor importance from equipment in own and adjacent work areas.

In connection with this attribute the parties stipulated that Joint Exhibit # 9 set forth procedures which "delineate an 'objective' means for supplementing the 'subjective' evaluation of shop noise. . . ." (Arb. p. 17) The Board first reviewed the evidence of shop noise introduced by the Union's expert witness, Mr. Baughman. The Board stated:

Without going into detail as to the method used by Mr. Baughman, I agree with the Company's position which is borne out by Mr. Baughman's testimony that he did not properly apply the agreed upon procedures which are set forth in Jt. Ex. 9. Therefore, insofar as Baughman's testimony is

concerned, he does not support the Union's position that the noise level is of major importance and warrants a 4th degree designation. (at 22)

Chairman Kleeb then turned to the Union's contention that the Company's surveys did not support a conclusion that the noise level should be confined to the 3rd degree, analyzing the bases upon which the Company came to its conclusions. Based on its reading of the Company surveys the Union urged that

. . . since three out of eight readings on the survey of June 8, 1973 are scored in the 4th degree, the attribute should be scored in the 4th degree since three out of eight constitutes 37½% of the decibel readings. The Union then argues that in another job survey involving Punch Press Operator MS 10490 and MS 10490–A, the Company designated this attribute in the 4th degree where only seven out of twenty-two readings were in the 4th degree level. Since this was only 31⁸/₁₀% of the readings they fell in the 4th degree, and the Company should, therefore, designate the attribute in the instant proceedings as 4th degree since 37½% of the readings fall in the 4th degree. (at 22–3)

In effect, the Union contended that the Company should apply its criteria for determining degrees uniformly. If one job was rated in the 4th degree where 31⁸/₁₀% of the readings fell in the 4th degree, then another job should also be rated in that degree where a greater percentage of the readings fell in the 4th degree. The arbitrator accepted this contention, stating:

Because of the importance of the use of the Plan in fixing wage rates, I believe it was incumbent upon the Company to demonstrate without a shadow of a doubt that it properly rated this attribute. I do not believe the Company has done this. On the other hand, the Union has shown not only the improper application of Jt. Ex. # 9 but has also shown that the Company has rated other jobs in the 4th degree where less than 50% of the

readings are in the 4th degree. The Company's explanation for this . . is not supported by testimony, that this was done due to lack of rotation of the operators. I must, therefore, reject the argument that lack of rotation of the operators is the deciding factor in determining whether this attribute should be rated at the 3rd or 4th degree. I find that where, as here, the only properly computed survey under Jt. Ex. # 9 shows that 37½% of the readings are in the 4th degree, it is reasonable and logical to assign this degree to the job, rather than the 3rd degree. The attribute 'Working Conditions' should be awarded the 4th degree with 40 points. (at 24)

■ The Court cannot hold that the arbitrator's decision did not draw its essence from the agreement. On the contrary, it appears that the arbitrator was paying close attention to the provisions of the agreement, particularly Article 14, paragraph 1.1 which provides:

For the term of this Agreement the Company shall continue as heretofore its administration of the job evaluation plan currently in effect . . .,

and paragraph 1.2:

The parties recognize that the job evaluation plan gives proper weight to the skill, effort and responsibility required by hourly-rated job assignments and to the job conditions involved.

The arbitrator was concerned that the Plan be carried out in a uniform manner that did not suggest arbitrary behavior in the application of the criteria. In the Company's Exhibit 2c, "Purpose and Administration of Job Grading," which the Board had before it in reaching its decision, the purpose of job grading is discussed as follows:

Job grading as a whole serves the following purposes:

\* \* \* \* \* \*

4. Provides a logical and systematic basis for determining the correct relationship of one job to another.

\* \* \* \* \* \*

9. Furnishes assurance to the employee that the grade for his job was determined by a fair and uniformly applied plan and not by an arbitrary decision of some one individual. (p. 1)

In view of the arbitrator's legitimate concern for the Company's adherence to its Plan, it was not clearly erroneous for the arbitrator to require the Company to prove that the attribute of working conditions was properly scored, particularly since this burden of proof was imposed on the Company only after the Union had presented strong evidence that the scoring system was not uniform. The Union made a strong initial showing that the Company did not follow the job evaluation plan, as it was required to do by the agreement. The burden of proof was imposed on the Company since the Union had convincingly demonstrated that the Company was not following the Plan. Therefore, the Company was required to come back with even stronger proof to overcome the case made against it.

■ In addition, even if it be argued that the Board established this heavy burden of proof on the Company initially, it is not actually clear that it did so. The language "without a shadow of a doubt" therefore can be characterized as "ambiguous," either imposing an initial burden on the Company or imposing the burden simply in rebuttal of the Union's evidence. If the language is ambiguous, the Court cannot refuse to enforce the award on that basis. As quoted from *Enterprise Wheel:*

A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. (363 U.S. at 598, 80 S.Ct. at 1361)

■ The Company points to three past arbitrations, a 1966 case with Judge Carter, another 1966 case with Arbitrator Colby, and a 1968 arbitration with Arbitrator Cayton, as recognizing that the burden of proof is on the Union to demonstrate that the Company improperly rated a job. In response to the Company's contentions, the Court first notes that as a matter of arbitral procedure one arbitrator is not bound by the decision of another arbitrator. Arbitrator Kleeb himself, in considering the attribute responsibility for work of others, concluded:

Although both parties have cited the Awards of Arbs. Cayton and Stein, my conclusion was reached independently of either of these Awards, and I believe the evidence, without regard to either of these Awards, warrants the above conclusion. It so happens that my conclusion coincides with that of Arb. Cayton but I do not feel compelled to follow either Award as a matter of arbitrable [sic] procedure. There was no compelling evidence that Arbitration Awards are binding beyond the immediate issue being arbitrated. (at 16)

Secondly, the excerpts quoted by the Company simply illustrate that the arbitrators put the initial burden of going forward on the Union. These decisions do not involve situations in which the Union has produced evidence that the Company is not following a unified interpretation of the Plan. The paragraph quoted by the Company from the decision of Arbitrator Colby supports this notion of a shifting burden of proof:

In essence, the Union is here charging the Company with the violation of its agreement and inasmuch as there is at least a *presumption* that the Company's evaluation was contractually correct and proper, it is not its responsibility, in this proceeding, to establish that its action was not violative of the agreement. *In order for the Union to overcome such presumption it must produce competent and credible evidence* from which the Board of Arbitration can reasonably decide in its favor. The Union cannot rest its charge that the Company's action was violative of the labor agreement upon mere conjecture or belief. Instead, it must be held to the solemn responsibility of proving that the Company's action was

in violation and it must satisfy that burden in order to prevail in this case. (emphasis supplied)

■ The overall consideration which the Court must keep in mind when discussing the burden of proof issue is that the Supreme Court has specifically declared that arbitration awards are to be favored and are to be enforced unless they do not draw their essence from the agreement. Even if the burden of proof is one that the Court itself would not have imposed, the Court may not fault the burden imposed by the arbitrator unless it cannot be based on any facts or reasons. (*See Amalgamated Meat Cutters v. Neuhoff*, 481 F.2d 817 (5th Cir. 1973)) There were clearly enough facts to support the arbitrator's conclusion that the attribute of working conditions should be upgraded, and these facts are set forth at great length in the opinion and award. The use of the "without a shadow of a doubt" language cannot be said to taint the entire award and to require the Court to vacate it.

The Court concludes, therefore, that the upward scoring of the attribute of working conditions does not lack facts to support it and does not depart from the essence of the contract.

### Unavoidable Hazards

As noted above, this contention revolves around the Company's interpretation of the decision of Chief Judge Northrop in *C. E. W. v. Western Electric* as binding on the parties. The Company contends that the Board ignored this opinion when it stated: "I must disagree with the conclusion stated in the Interpretations and Guides that no evaluation will be given for exposure to hearing." (p. 33)

Chief Judge Northrop's opinion must be examined in detail to determine whether he held, as the Company contends, that the Interpretations and Guides were binding on the parties and that the Board could not disagree with a conclusion stated in them. In that case, the Union brought an action to contest an arbitration award that the Company

properly graded the attributes "Education" and "Responsibility for Material or Product" for the job of Extruder Equipment Operator, M.S. 10480. The court began by describing the job grading system and then presented the Union's contention:

It is the Union's contention that the Company's use of the so-called 'Code of Interpretation' in its evaluation of the job was improper in that the code was a document unilaterally created by the Company that did not have any basis in the collective bargaining agreement. In addition, the Union contends that the Board of Arbitration, in giving credence to the Code, acted outside its scope of authority and in direct contravention to the provisions of the collective bargaining agreement. (at 1279)

The Company contended that the Plan could not be applied and administered without the exercise of judgment to resolve ambiguities and fill in gaps and that the Code of Interpretation could be used for that purpose. It pointed to Article 14, paragraph 1.2 of the agreement which directed the Company to "continue as heretofore its administration of the job evaluation plan currently in effect."

As stated by the court, the issue was:

. . . whether the Board relied on the Code of Interpretation in formulating its opinion and if it did, whether such reliance was improper. (at 1279)

The court then reviewed the law applicable to setting aside an arbitrator's decision, limiting its scope of review to whether the award lacks any facts to support it or whether the decree is within the essence of the contract.

The court first considered the Union's contention that the Company and the Board acted improperly in placing reliance on the Code of Interpretation. The court noted Article 14, paragraph 1.2 and stated that "it was a question of fact for the arbitrators to determine whether the plan as previously administered utilized the practices that were subsequently incorporated in the 'Code of Interpretation.' " The court then held

that the decision that the Code was a part of the agreement *was not clearly erroneous.* The court went on to hold that, even though the use of the Code was not wrongful, there was sufficient evidence to support the Board's opinion without resting on that contention.

In determining the import of Chief Judge Northrop's decision, the function of a court in reviewing a labor arbitration award must be kept clearly in mind. Its function is quite limited. A court is concerned with whether the award is not supported by any facts or whether it does not draw its essence from the agreement. A court cannot hold that an arbitrator *must* reach any particular decision; rather, it is limited to holding that the award reached was or was not based on fact and on the agreement. Thus, it is apparent that Chief Judge Northrop did not hold that all arbitrators are bound to follow the Interpretations, as the plaintiff contends. Instead, he held that it was not clearly erroneous for the particular arbitrator in the case before him to rely on the Interpretations. He did not fashion a rule of law to be binding on all future arbitrators, for he was concerned only with the award before him. It is the role of the court in a suit to vacate an award to examine the award in accordance with the standards in the *Steelworkers Trilogy.* It is not the court's role to establish rules of law to serve as binding precedent in all future arbitrations.

In addition, and equally important, an examination of the award itself shows that the arbitrator was faced with a situation in which the Plan and the Interpretation conflicted, and he chose to follow the Plan rather than the Interpretations. Certainly, in so doing, the arbitrator was abiding by the agreement.

The Plan contains the following explanation of the attribute unavoidable hazards:

This attribute relates to the accident and health hazards to the employee on the job being evaluated. Hazards to other employees are covered under the attribute 'Responsibility for Safety of Others.'

When evaluating the hazards present on a particular job it is necessary if a hazard is present to determine whether it has been safeguarded to an extent that is foolproof thereby eliminating the hazard; whether it has been safeguarded but the safety of the employee depends on the correct use of protective methods and therefore some degree of hazard remains; whether the hazard is such that it cannot be safeguarded; and in all cases what the probable effect on the physical well-being of the employee will be.

If the job is such that the hazard involved is not present full time, such condition should be taken into account when making the evaluation; e. g. a job on which there is a hazard present for two hours a day and the balance of the day does not involve any hazard should not be evaluated in the same degree for 'Unavoidable Hazards' as a job on which there is a hazard present eight hours a day. (at 14)

The Company rated this attribute in the 2nd decree which states:

Work having minor health hazards such as minor skin diseases, or where probable accidents are limited to cuts, bruises, burns, abrasions, etc., of minor degree.

The Union claims this attribute should be rated at least in the 4th degree. The 3rd and 4th degrees read as follows:

3rd Degree—Involves exposure to lost-time accidents, such as broken bones, eye injuries, hernia, loss of fingers or some exposure to occupational disease.

4th Degree—Exposure to accidents such as loss of an arm, a leg, partial loss of sight, etc., or health hazards which would result in partial disability.

The job grade substantiating data for Unavoidable Hazards assigns a 2nd degree rating with 10 points and reads as follows:

There is exposure to lost-time injuries from own and others reel-handling ac-

tivities; however, exposure exists less than 25% of the time. Safety equipment provided minimizes the probability of more serious injuries.

The Union contended that the following hazards supported their position that the 4th degree applied to the attribute:

A. Hazard of flying wire hitting testicle resulting in loss of testicle is a 'partial disability'.

B. Hazard of flying wire hitting eye resulting in temporary or permanent loss of sight is a 'partial disability.'

C. Hazard of noise—hearing impairment is a 'partial disability.'

D. Hazard of strenuous and continuous bending resulting in back disability is a 'partial disability.'

E. Above B hazard resulting in 'partial loss of sight.' (P. 26 of Opinion and Award)

In addition, the Union contended that there were two hazards which required a rating of 5th degree.

That degree states "Exposure to occupational diseases or accidents which would usually result in death or total disability." The two hazards were:

1. Hazard of flying lock nut resulting in "death."

2. Hazard of flying wire causing loss of both testicles resulting in "Total Disability."

The arbitrator concluded that he did not agree with the Company's scoring of 10 for this attribute. He dealt first with the sound hazard and considered the following excerpt from the Interpretations:

Mandatory use of properly fitted ear protective devices, as specified by Manufacturing Standard 16,000, in addition to the safeguard provided by periodic audiometric tests, reduce the chance of hearing impairment to a very remote possibility.

Since the Plan only considers injuries that are likely to occur and precludes consideration of remote injuries that might be possible, no evaluation consideration will be given for exposure to hearing impairment. (paragraph 10)

However, the arbitrator was also faced with evidence that the chance of hearing impairment in the case before him could not be considered a "very remote possibility" as stated in the Interpretations but that "partial disability" as stated in the Plan could indeed occur. He was, therefore, faced with a Plan that provided for a 4th degree rating if "partial disability" might result, with Interpretations that stated no consideration could be given for exposure to hearing impairment, and with evidence that the noise of the job did expose the employees to the possibility of partial disability.

The arbitrator reasoned:

The Company's brief concedes that 'There is no question that dbA readings in the high speed twister area are over 90, and that an operator exposed to such a level of noise for a continuous period of eight hours may be open to some hazard. But this is precisely why the Company provides and requires the use of the ear protective devices by Twisting Machine Operators. And the undisputed evidence shows that these ear protective devices attenuate the noise to a level well below published hazardous standards.' In light of the Company's admission, I must disagree with the conclusion stated in the Interpretations and Guides that no evaluation will be given for exposure to hearing. *I find this interpretation conflicts with the plan itself.* The plan calls for a 4th degree rating if the exposure would result in partial disability. The operator is exposed to this noise 100% of the time. It is logical to assume that without the ear protective devices the Operator would be exposed to the possibility of total deafness which would partially disable him. This would require a 4th degree rating. However, accepting the application of Section 2(b)(1) of the Interpretations and Guides the use of the ear protective devices justify the reduction to the 3rd degree. I conclude that the Plan calls for a rating of 3 for the Sound hazard. (p. 33; emphasis supplied)

Section 2(b)(1) of the Interpretation provides:

Where either or both of the following conditions exist, one degree less than full credit shall be given for the probable injury classification involved.

(1) The effectiveness of the safety device provided is dependent upon correct usage by the job incumbent. Although such safety devices are recognized as not being foolproof, they do, nevertheless, affect the probability of occurrence by reducing either the exposure time or the severity of the injury.*

The Court holds that where the arbitrator considered a conflict between the Plan and the Interpretations to exist it was not a departure from the essence of the agreement for him to follow the Plan rather than the Interpretations. Further, the Court cannot hold that the arbitrator's decision that such a conflict existed was clearly erroneous. The Plan provided that partial disability should be taken into account when determining job grades, while the Interpretations stated no consideration could be given for exposure to hearing impairment. This Interpretation was founded on the assumption that hearing impairment is not likely to occur and is only a remote injury. The arbitrator could have concluded from the evidence before him that the assumption on which the Interpretation was based was no longer valid and that the Plan should be followed instead. The making of such a conclusion and the decision to follow the Plan cannot be said to be without any foundation in fact.

However, even if the Court were to hold that the arbitrator should not have changed the degree based on exposure to hearing impairment, the award would still have to be sustained, for there were other grounds for changing the degree assigned to unavoidable hazards. First, the arbitrator held that the hazard of flying wire to the eye should be rated in the third degree. (p. 34) Second, he concluded that the hazard of flying wire to parts of the body other than the eye necessitated a third degree rating. Finally, he found that the hazard of a flying lock nut was an added reason for finding a third degree rating. Thus, the arbitrator concluded that the unavoidable hazards attribute should be rated in the third degree.

In conclusion, the Court holds that the arbitrator's rating of the attribute unavoidable hazards drew its essence from the agreement and did not exceed the scope of the submission.

*Summary*

The Court holds that the Company is not entitled to judgment as a matter of law and will deny its motion for summary judgment. The decision of the Board of Arbitration was supported by the facts and drew its essence from the agreement between the parties. As there is no dispute as to any material fact and as the defendant is entitled to judgment as a matter of law, the Court will grant the defendant's motion for summary judgment dismissing the complaint in its entirety and specifically enforcing the award of the Board of Arbitration.

The defendant has also counterclaimed for certain damages, specifically interest and attorney's fees. The Court will now turn to the damage question.

*Attorney's Fees*

The Union asks the Court to award it reasonable attorney's fees, citing *Automobile Workers Local 149 v. American Brake Shoe Co.*, 298 F.2d 212 (4th Cir. 1962), which cites the following language of the Supreme Court:

The Labor-Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the

* Based on attribute definition wording, '. . . it is necessary if a hazard is present to determine . . . whether it has been safeguarded but the safety of the employee depends on the correct use of protective methods and therefore some degree of hazard remains; . . .'.

penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). (at 216)

From the above language the Fourth Circuit concluded that even though the statute lacked an express authorization for attorney's fees:

> In an appropriate case attorney's fees should be awarded against a party who, *without justification,* refuses to abide by the award of an arbitrator. (at 216; emphasis supplied)

The Fourth Circuit then went on to deny the attorney's fee in that case because at the time the Company had refused to abide by the award the law was unclear as to a federal court's jurisdiction to enforce an arbitration award in a labor dispute.

█ The Court does not agree with the Union's contention that the Company had no real justification for failing to abide by the award except to stall and to save some interest on the sums it owes under the award for back pay. It cannot be said that the Company had no justification for bringing the instant suit. The Company raised a good faith challenge to the award and supported its contentions with extensive exhibits and memoranda. Both parties presented the Court with detailed briefs and many legal citations. In order to hold that a party is refusing to abide by an arbitrator's award without justification, the Court must be satisfied by clear evidence that legal precedent is entirely on the side of the opposing party and that a reasonable person would know the law was completely one-sided. Such a situation does not exist here. Whether the arbitrator exceeded the scope of his submission is not easy to determine in certain cases, and the Court does not think the Company's desire to submit this question to the Court was frivolous or simply a delaying tactic. Therefore, the Court will not award attorney's fees to defendant.

*Interest*

The defendant seeks interest on all sums of money owing to the Twisting Machine Operators as a result of the Arbitration Award, from the date of the award to the date of payment, at the highest lawful rate of interest which under the laws of the State of Maryland an individual may charge a corporation. The Union contends that the language noted above from *Textile Workers v. Lincoln Mills* supports such an award. The Union also cites *District 50 United Mine Workers v. Bowman Transportation Inc.,* 421 F.2d 934 (5th Cir. 1970) and *Local Union 494 IBEW, AFL–CIO v. Artkraft Inc.,* 375 F.Supp. 129 (E.D.Wis. 1974) in support of its contention.

> In *Artkraft, supra,* the court stated:
> The second issue is whether 6% interest on the back pay from the date of the award should be granted. Interest has been awarded in numerous other back pay situations on the theory that back pay creates a debt from employer to employee, and interest is needed to make the employee whole. It is not equitable for the employer to have the use of the employee's money without paying the employee for this use.
>
> . . . .
>
> In this case the arbitrator's award requiring payment of the retroactive wage increase created a debt between the employer and employee. During the period of noncompliance the employers have had use of the employees' money. In order to make the employees whole they are granted 6% interest from the date of the original arbitration award on the wage increase which is due from September 1, 1971 to November 14, 1971. (at 132)

█ The Court agrees with the Company's contention that in the instant case no debt was created by the arbitration award. Article 11, paragraph 10 of the

collective bargaining agreement provides:

> The decision of the Board of Arbitration made in compliance with the foregoing shall be final and the parties hereto agree to abide by such decision. However, the service of a written claim by either party upon the other (which service may be made at any time after demand for arbitration under Paragraph 2 of this Article, but not later than thirty (30) days following a final decision by the Board of Arbitration) asserting that the issue sought to be arbitrated is not arbitrable or that the Board of Arbitration has exceeded its authority, *shall at that point automatically stay the arbitration proceedings or the effect of the decision by the Board of Arbitration,* as the case may be, *pending final adjudication* of such claim by the courts, provided the party asserting such claim initiates court action for such adjudication no later than thirty (30) days following the service of such claim.

Granting interest which runs from the date of the award would make that award effective as of the date of the decision, a result which is specifically precluded by the parties' agreement. Therefore, the Court declines to award the interest requested by the Union.

*Conclusion*

On these cross motions for summary judgment, the Court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment. The effect of this ruling is that the award of the Board of Arbitration stands as issued on January 22, 1975, thereby confirming the award. Defendant's counter-claim for attorney's fees and interest will be denied.